LUCAS *v.* BISHOP.

5-533                                    273 S. W. 2d 397

Opinion delivered December 13, 1954.

*L. A. Hardin* and *Carl Langston,* for appellant.

*Lasley, Spitzberg, Mitchell* and *Hays,* for appellee.

GRIFFIN SMITH, Chief Justice. Kenneth L. and Wilma Lucas were divorced May 21, 1951, when their only child, Nick Alvin, was slightly more than three years of age. Wilma married Kenneth when she was seventeen. Decretal findings were that Wilma had been guilty of abuse, contempt, and studied neglect. By consent custody of the boy was awarded the mother.

Charles G. Bishop, whose wife divorced him July 23, 1951, married Wilma two days later.

In June, 1951, Lucas sought an order divesting Wilma of the custody to which he had agreed. He as-

serted that facts not known to him when the decree was rendered had come to his attention. The chancellor entered an order in substantial compliance with Lucas' petition. Wilma appealed and we reversed. *Bishop* v. *Lucas*, 220 Ark. 871, 251 S. W. 2d 126.

In September, 1953, Lucas as "next friend" of his son sued Bishop for $50,000. It was alleged that prior to the divorce action brought by Lucas, Nick Alvin enjoyed a comfortable, happy home, but Bishop made clandestine visits in the course of which he enticed the child's mother to such an extent that her domestic affections were alienated; that following the Lucas divorce Bishop persuaded Wilma to establish a residence at Mabelvale ". . . where he continued his malicious and wrongful conduct in alienating the affections of the plaintiff's mother from his father, [and for these reasons] Nick Alvin has been deprived of [the type of home heretofore referred to], the parental care of his mother and father in their home, [also] the financial security he was being afforded prior to such alienation of his mother's affections, and in all probabilities will be deprived of financial support and security he would have gotten in the future. . . ."

A further allegation was that the defendant had done everything within his power to wrongfully influence the boy against his father, thus creating an antagonistic attitude.

Bishop demurred to the complaint. Wilma Bishop, as mother, natural guardian, and next friend of Nicky Alvin, moved to dismiss. This action was the equivalent of an intervention in which Bishop joined, and was sworn to by Wilma. The child, it was asserted, is with its mother and his stepfather in their recreated matrimonial status, where all of its necessities and conveniences are supplied, and where mother love touches the child's life in all of its phases.

From orders sustaining Bishop's demurrer and granting the joint motion to dismiss Lucas has appealed.

Common sense and some knowledge of the practical affairs of life inform us that six-year-old Nick Alvin did not initiate this suit. Lucas, who through unfortunate circumstances has been deprived of the custody of his son—an arrangement that when made involved mutuality —now feels that the judiciary ought to shape for the boy's benefit a financial substitute for the conventional home environment that children have a right to expect from those who brought them into existence.

Unfortunately the wrong here emphasized is one that has not been legislatively translated into dollar compensation in this state; nor does the common law supply a plaintiff's answer. The general rule regarding the right of a divorced husband or wife to sue for lost love because of acts or conduct subsequent to the decree seems to be that what is sometimes referred to in this character of proceedings as affection is non-existent, hence there was nothing to alienate.

The effect of Lucas' suit is to assert that Nick Alvin had a vested interest in the marital status of his father and mother with the inherent right to have that relationship maintained for his personal benefit,—an affiliation that presumptively would have continued until the plaintiff was twenty-one years of age had it not been for Bishop's wrongful interference.

At the 1951 divorce trial Lucas testified that Wilma was a good mother and that she invariably took good care of her son—''always,'' he said. The alienation for which compensation is now sought, therefore, is not Nick Alvin's loss of his mother's love; rather, it is the father's loss of Wilma's affections and their son's supposed legal right to be reared in an atmosphere of reciprocal concern.

Appellant calls attention to Art. 2, § 13, of the Arkansas constitution: ''Every person is entitled to a certain remedy in the law for all injuries and wrongs he may receive in his person, property, or character. . . .''

The argument is that unless relief is granted by this court it is apparent that appellant will be without a rem-

edy and that he will be deprived of just rights without due process of law.

But the difficulty is that in this state there is no statutory law to which recourse may be had, and the common law is not helpful, hence "denial of due process" is rhetorical rather than substantive.

Three states—Illinois, Michigan, and Minnesota, and a Federal court in Illinois—have applied the rule appellant would invoke. Perhaps the foundation case is *Daily* v. *Parker*, 7 Cir., 152 Fed. 2d 174, 162 A. L. R. 819. The determination that a child's rights should be protected by transumptive reasoning supported by the Illinois bill of rights found expression in the Daily-Parker opinion delivered in 1945. The federal tribunal said that when a state had not declared the law on a particular subject it had power to do so. Since that time the precedent has been followed by Illinois state courts.

The Daily-Parker case quotes at length from Dean Pound's Spirit of the Common Law, stressing the thesis that Anglo-American law "is fortunate indeed in entering upon a new period of growth with a well-established doctrine of lawmaking by judicial decision." The process, says the author, is known as "judicial empiricism." [1] Also relied upon are quotations from Pollock's 1939 edition of Torts, and Cooley's Third Edition of Torts, "Family Rights," p. 464.

Counsel for appellant concede that the Daily-Parker case and the Illinois, Michigan, and Minnesota decisions represent minority views against which are to be considered opinions in California, Colorado, Connecticut, Massachusetts, New Jersey, New York, North Carolina, Texas, Wisconsin and the U. S. Court of Appeals for the

---

[1] Webster's New International Dictionary gives the term a variety of meanings.

First: "The method or practice of an empiric, as (a) pursuit of knowledge by observation and experiment; (b) a practice of medicine founded on mere experience, without the aid of science or a knowledge of principles; (c) ignorant and unscientific practice; charlatanry; quackery; (2) the philosophical theory which attributes the origin of all our knowledge to experience, applied specially to British philosophy from Locke to Hume."

District of Columbia. An annotation on *Daily* v. *Parker* is to be found in 162 ALR, 819. There is editorial comment.

In *Henson* v. *Thomas,* 231 N. C. 173, 56 S. E. 2d 432, 12 A. L. R. 2d 1171, the Supreme Court of North Carolina said: ''The mutual rights and privileges of home life grow out of the marital status. Affection, guidance, companionship, loving care, and domestic service constitute, in part, the mother's contribution to the happiness and well-being of the family circle. Such obligations on her part are not legal in nature and may not be made the subject of commerce and barter at the counter.''

The creation of a right of action for a child's benefit to compensate for loss of the intangible elements set out in the complaint here is a subject that addresses itself to the state's policy-forming department. Until the legislature has seen fit to designate the redress which, under Art. 2, § 13, of the constitution it has a right to do, the judiciary should not transgress the coördinate boundary established by Art. 4, § 1, of the constitution: ''The power of the government of the State of Arkansas shall be divided into three distinct departments, each of them to be confined to a separate body of magistracy, to-wit: Those which are legislative to one, those which are executive to another, and those which are judicial to another; [and, § 2] no person or collection of persons, being of one of these departments, shall exercise any power belonging to either of the others. . . .''

By this decision we do not wish to leave the impression that in no circumstances of affirmative aggravation or wanton misconduct affecting an infant that a third person could not be adjudged to have designed a course of conduct upon which a cause of action might be predicated under existing methods of redress. But we do hold that in the case at bar Lucas as next friend has not shown that financial compensation for the things complained of has been authorized by any law, and we are not persuaded that judicial empiricism is the answer.

Affirmed.